UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In Re: Case No. 16-16959-BKC-LMI

SONIA OLIVARES, Chapter 13

Debtor.

TRUST MORTGAGE'S CLOSING ARGUMENT IN SUPPORT OF DENYING (A) THE MOTION TO VALUE AND DETERMINE SECURE STATUS OF LIEN ON REAL PROPERTY OF TRUST MORTGAGE [ECF NO. 25] AND (B) CONFIRMATION OF THE DEBTOR'S SEVENTH AMENDED PLAN [ECF NO. 71]

This matter came before the Court on September 29, 2016 on Sonia Olivares' (the "Debtor") Motion to Value and Determine Secure Status of Lien on Real Property of Trust Mortgage, LLC [ECF No. 25] (the "Valuation Motion"), Trust Mortgage, LLC's ("Trust Mortgage") Objection to the Valuation Motion, confirmation of the Debtor's Seventh Amended Chapter 13 Plan (the "Plan") [ECF No. 71] and Trust Mortgage's Objection to Confirmation of Plan [ECF No. 47]. Trust Mortgage submits its closing argument in support of denying (A) the Valuation Motion and (B) confirmation of the Debtor's Plan on the basis that the Debtor's Plan has been proposed in bad faith in violation of section 1325(a)(3) of title 11, United States Bankruptcy Code (11 U.S.C. §§ 101, et seq.) (the "Bankruptcy Code") and is unconfirmable under section 1325(a)(6) of the Bankruptcy Code.

**Factual and Procedural Background**

The Debtor is the owner of real property located at 18420 NW 78 Avenue, Hialeah, Florida 33015 (the "Real Property"). The Real Property is the Debtor's principal residence. At the time the Debtor filed this pending chapter 13 case, the Real Property was encumbered by a first mortgage held by U.S. Bank, NA (the "Senior Lender") and serviced by Ocwen Loan Servicing, LLC (the "Senior Debt") and a second mortgage held by Trust Mortgage.

Prior to the filing of this chapter 13 case, the Debtor filed a chapter 13 case on January 13, 2015, captioned *In Re Sonia Olivares*, 2015-10688-LMI (the "First Bankruptcy Case"). The Fifth Amended Plan (the "Confirmed Plan") [ECF No. 105] was confirmed by the Court in the First Bankruptcy Case. The Confirmed Plan's payment was $5,076.78 per month, beginning month five (5), and contained provisions to treat the Senior Debt in accordance with the Mortgage Modification Mediation Program[1] (the "MMM Program"), to pay the on-going fees associated with the Real Property's Homeowner's Association, to cure obligations for priority claims owed to the Internal Revenue Service and the State of Florida Department of Revenue and to strip off Trust Mortgage's second lien. The First Bankruptcy Case was initially dismissed as a result of the Debtor's failure to remain current on her obligation to make payments under the Confirmed Plan.

After dismissal of the First Bankruptcy Case, the Debtor filed a Motion to Reinstate Chapter 13 Case and Certificate of Funds and Motion to Modify and Request for Approval of Fees (the "Motion to Reinstate") [ECF NO. 119], together with a First Modified Plan (the "Modified Plan") *See* [ECF No. 121] in the First Bankruptcy Case. Under the First Modified Plan, payments to the Senior Lender and the homeowner's association of the Real Property were eliminated because the Real Property was being "dropped out of the plan in month 12 **as the Debtor cannot afford payments**." *See* [ECF No. 121] in the First Bankruptcy Case. The First Modified Plan also granted *in rem* relief [from the automatic stay] to the Senior Lender while continuing to "strip" Trust Mortgage's lien on the Real Property. *See* [ECF No. 121] in the First Bankruptcy Case.

Trust Mortgage objected to reinstating the case under the First Modified Plan on the grounds that while the Debtor was current under the proposed First Modified Plan, she was not current

[1] The MMM program was adopted by the United States Bankruptcy Court for the Southern District of Florida on April 1, 2013 and revised on August 1, 2014.

under the Confirmed Plan, which under applicable local rules is a prerequisite to reinstatement of a dismissed case. *See* [ECF No. 123] in the Prior Bankruptcy Case. Additionally, Trust Mortgage argued that it was inequitable to modify the Confirmed Plan to eliminate and carve-out the Real Property while granting *in rem* relief to the Senior Lender, and at the same time lien stripping Trust Mortgage. By agreement between the Debtor and Trust Mortgage and Order of this Court (the "Reinstatement Order"), the First Bankruptcy was reinstated subject to Trust Mortgage being granted *in rem* relief from the automatic stay, similar to relief offered to the Senior Lender under the First Modified Plan. *See* [ECF No. 133] in the Prior Bankruptcy Case. These negotiations were entered into in an effort to resolve the dispute and permit the Debtor to reinstate the First Bankruptcy under a modified plan which the Debtor could afford.

As a result of obtaining stay relief, Trust Mortgage immediately rescheduled the foreclosure sale of the Real Property for May 16, 2016. In a blatant effort to frustrate and delay the rights of Trust Mortgage, on May 3, 2016 the Debtor filed her Motion to Dismiss Case without Prejudice or in the Alternative Motion to Vacate Order Vacating the Order Granting the Motion to Determine Secured Status of Lien of Trust Mortgage [DE #133] and Approving Attorneys' fees Requesting an Emergency Hearing (the "Motion to Dismiss or Vacate") [ECF No. 145], for the sole purpose of stopping Trust Mortgage's scheduled foreclosure sale. After a hearing, this Court denied the Debtor's request to vacate the Order Vacating the Order Granting the Motion to Determine Secured Status of Lien of Trust Mortgage and granted the Motion to Dismiss without Prejudice (the "Final Dismissal"), while also requiring the Debtor to reimburse Trust Mortgage's attorney's fees. The Debtor filed the instant chapter 13 case on May 13, 2016 with the express intent of stalling and derailing Trust Mortgage's foreclosure sale. Trial Tr. 44-45, September 29, 2016.

On June 7, 2016, the Debtor filed the Valuation Motion [ECF No. 25]. Pursuant to the Valuation Motion, the Debtor asserts that there is no equity in the Real Property in excess of the amount

owed to the Senior Lender, and as a result, the mortgage lien of Trust Mortgage should be stripped. In addition, the Debtor states that the debt owed to the Senior Lender is $823,372.03 and the value of the Real Property is $459,544.00. Trust Mortgage does not dispute the Debtor's claim of value of the Real Property or current lack of equity in the Real Property in excess of the amount owed to the Senior Lender. However, Trust Mortgage argues that it would be inequitable to strip off the lien of Trust Mortgage, as the Plan is not confirmable. Additionally, based on the Senior Debt as disclosed in the Valuation Motion, the Debtor does not meet the eligibility requirements to be a "debtor" under section 109(e) of the Bankruptcy Code and as a consequence lacks standing before this Court. Trust Mortgage reserves all rights to file a motion to dismiss the pending chapter 13 case on these and any other grounds.[2]

The Debtor's Plan proposes to strip the mortgage lien of Trust Mortgage on the Real Property[3] while providing for the following treatment of the Senior Lender under the Plan:

> The Debtor is treating U.S. Bank, NA, serviced by Ocwen, shall be [sic] treated directly by way of attempting to modify the mortgage outside of the plan for the Real Property located at 18420 NW 78th Avenue, Hialeah, FL 33015. <u>Should the Debtor be unsuccessful in the modification, the debt shall be discharged in the instant bankruptcy upon receipt of her discharge. (emphasis supplied).</u>

Plan, Other Provisions Section [ECF No. 71].

On September 29, 2016 this Court held an evidentiary hearing on the Valuation Motion and Confirmation of the Plan (the "Hearing"). At the conclusion of the Hearing, the Court directed the parties to submit written closing arguments.

## <u>Argument</u>

[2] The Senior Debt disclosed in the First Bankruptcy case was $441,736.00. *See* ECF No. 25 in the First Bankruptcy Case.

[3] The Cram Box of the Debtor's Plan seeks to Value the Real Property securing Trust Mortgage's Claim, providing for no payments to Trust Mortgage during the life of the plan. ECF No. 71.

The Plan is not confirmable under the Bankruptcy Code. In essence, the Debtor has proposed a plan built on a "house of cards" that seeks to bifurcate her financial obligations to the Senior Lender outside of the Plan from her other creditors, including Trust Mortgage, whose claims are being treated under the Plan. The fundamental question that the Debtor must address is whether such treatment (or more appropriately non-treatment) is permissible under the Bankruptcy Code. Although section 1322(b)(2) of the Bankruptcy Code allows a debtor to leave unaffected the rights of a secured creditor under a chapter 13 plan in respect of a security interest in a debtor's principal residence, it does not allow a debtor to attempt to modify the rights of the secured creditor outside the plan while simultaneously discharging the debtor's obligation to that creditor should the attempts at debt modification be unsuccessful. *Bank of America, N.A. v. Dominguez*, Case No. 1:12–cv–24074–RSR (Doc. No. 25) (S.D.Fla. Sept. 24, 2013) [add case citation]. Indeed, the practice of modifying a secured lender's mortgage outside of a plan (and outside of Court oversight and the provisions of the MMM Program) is suspect and contrary to the transparency policies embodied in the Bankruptcy Code. The ultimate question for the Debtor is why did she propose a plan that is highly contingent on reaching a secret deal with the Secured Lender (and thus unconfirmable) rather than negotiating a modification under the MMM Program? As the Debtor testified, paying the Secured Lender outside of a plan is more "comfortable." Trial Tr. 24. While the goal of chapter 13 is the adjustment of debts, the comfort of a debtor should not be put above the rights of her creditors.

In summary, the Debtor is seeking to confirm a plan where one secured claim of the Debtor's key asset, to wit the Real Property, is being carved-out from any treatment under the Plan (while inequitably lien stripping Trust Mortgage) and subject to a speculative, uncertain, unquantified, unproven, and ultimately contingent loan modification outside of the four-corners of the Plan. The Debtor has failed to satisfy her burden of proof regarding any ability to service the speculative loan

modification or, for that matter, any proposed payments under the Plan, should the Court determine that carving-out the Real Property is even permissible under the Bankruptcy Code or equitable to Trust Mortgage.

Section 1325(a)(3) of the Bankruptcy Code requires that a chapter 13 plan "be proposed in good faith." Section 1325(a)(7) of the Bankruptcy Code requires that "the action of the debtor in filing the petition was in good faith" and section 1325(a)(6) provides that the court shall confirm a plan only if "the debtor will be able to make all payments under the plan and to comply with the plan." The Debtor's Plan and past behavior as it relates to her alleged attempts to modify her debt obligation to the Senior Lender and strip Trust Mortgage's second lien demonstrates that the Debtor is seeking to manipulate the Bankruptcy Code to live in the Real Property without payment of any related debt obligations. Based upon the Debtor's actions, the Court cannot find that the Plan was filed in good faith. Given that the Plan cannot be confirmed, the Valuation Motion, which is inextricably interlinked with the Plan, should be denied.

As a preliminary matter, the treatment of the Senior Lender in the Other Provision Section of the Debtor's Plan illustrates the Debtor's attempt to impermissibly manipulate the Bankruptcy Code at the expense of its lenders. Section 1328(a)(1) of the Bankruptcy Code provides, in pertinent part, that "subject to subsection (d), as soon as practicable after completion by the debtor of all payments under the plan…the court shall grant the debtor <u>**a discharge of all debts provided for by the plan…"**</u> By carving-out the Senior Debt through the proposed grant of *in* rem relief and loan modification gambit, the Debtor's Plan is premised on a gamble that the Debtor can actually secure a loan modification outside of the chapter 13 bankruptcy. More egregious is the Debtor's attempt to secure a discharge of the Senior Lender's debt, in direct violation of the Bankruptcy Code, even though she has explicitly chosen not to treat the debt in the Plan [ECF No. 71]. In *Bank of America, N.A. v. Dominguez*,

the Southern District of Florida held that where a chapter 13 plan did not include a specific mortgage claim, the mere reference to the mortgage claim in the plan (as being paid directly outside the plan) did not render the claim one governed by the plan. *Bank of America, N.A. v. Dominguez*, Case No. 1:12–cv–24074–RSR (Doc. No. 25) (S.D.Fla. Sept. 24, 2013). *See Generally, In Re Park*, 532 B.R. 392 (Bankr. M.D. Fla. 2015). If the debt is not a claim that is "provided for in the plan," the debt cannot be discharged as the claim has been left unaffected by the plan. *Id.* As such, this Plan cannot be confirmed because its plain language violates the intent of section 1328(a)(1) of the Bankruptcy Code by seeking to discharge a claim that is not provided for in the Plan.

The Eleventh Circuit delineated a non-exhaustive list of eleven factors that a court should consider in determining whether a chapter 13 plan has been proposed in good faith. *In re Kitchens*, 702 F.2d 885, 888-889 (11th Cir. 1983). The *Kitchen* factors include:

a. the amount of the debtor's income from all sources;
b. the living expenses of the debtor and his dependents
c. amount of attorney's fees;
d. probable or expected duration of the debtor's chapter 13 plan;
e. motivations of the debtor and his sincerity in seeking relief under the provisions of chapter 13;
f. the debtor's degree of effort;
g. the debtor's ability to earn and likelihood of fluctuation in his earning;
h. special circumstances such as inordinate medical expense;
i. frequency with which the debtor has sought relief under the Bankruptcy Reform Act;
j. circumstances under which the debtor contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors;
k. the burden which the plan administration would place on the trustee;
l. the type of debt to be discharged and whether such debt would be nondischargeable;
m. the accuracy of the plan's statements of debts and expenses and whether any inaccuracies are an attempt to mislead the court;
n. extent to which the claims are modified and extent of preferential treatment among classes of creditors.

Applying these factors to the instant case, it is abundantly clear that the Plan was filed in bad faith. First, the Debtor's Plan is facially unconfirmable under section 1325(a)(6) of the Bankruptcy Code, which provides that the court shall confirm a plan only if "the debtor will be able to make all

payments under the plan and to comply with the plan." As discussed in detail below, the testimony presented by the Debtor, the Debtor's bankruptcy schedules, and the August 23, 2016 loan modification package submitted to the Senior Lender by the Debtor do not support confirmation of the Plan. Second, the Plan was not proposed in good faith since the Debtor is attempting to "strip" Trust Mortgage of its lien on Real Property that is no longer addressed in the Plan and subject to *in rem relief* in favor of the Senior Lender. Notably, the Debtor has failed to provide any legal authority for carving-out one claim encumbering the Real Property while stripping the rights of the second claim encumbering the Real Property under the Plan. Third, the bankruptcy petition was filed in bad faith with the sole purpose to delay Trust Mortgage's May 16, 2016 foreclosure sale. It is apparent from the record of the Hearing that the Debtor presented no evidence (i) that the Senior Lender will agree to modify the mortgage, (ii) disclosing the terms of such modification or (iii) as to whether the Debtor will have resources to make mortgage payments if the Senior Lender agrees to a modification, which at this juncture, it has not. A gamble that the modification will ever occur is no basis for confirmation of the Plan. In essence, the Debtor is asking the Court to confirm a plan subject to an unproven contingency.

**a. Debtor's current inability to restructure the Senior Debt and make any payments to the Senior Lender**

The Debtor has testified that the income scheduled in the First Bankruptcy Case, i.e., $3,153.21, was correct at the time of filing her schedules. Trial Tr. 37-8. The Debtor's initial schedules filed in this case reflect an income of $5,073.00[4] per month with a disposable income of $1,497.00 while the proposed monthly payments under the Debtor's Plan (without regard to the Senior Lender debt obligations) total $1,480.12. Pursuant to the Loan Modification Application the Debtor submitted to the Senior Lender on August 23, 2016, the Debtor's income is $3,500.00. The Debtor has testified

[4] Of the Debtor's $5,073.00 reported an income, $4,473.00 is attributed to the Debtor's dentistry business and $600.00 to the Debtor's Mother's SSI.

that this income is accurate and reflects a stabilized income. Trial Tr. 37-38, 48-49, 51. The Debtor has not neither testified to any other sources of income nor has the Debtor filed any amended schedules reflecting any additional sources of income. Based upon the income the Debtor has disclosed in her schedules and in her August 23, 2016 loan modification application, which the Debtor has also testified as being accurate, any realistic payment worked out with the Senior Lender, should the Senior Lender offer the Debtor a loan modification, will result in the Debtor being unable to comply with the terms of her Plan, if confirmed.

As evidenced by the Debtor's testimony, the Debtor has not been offered a modification by the Senior Lender. Trial Tr. 54-55. It should be noted that the HAMP Program applies to loans on a primary residence with a maximum debt of $729,750.00[5]. As evidenced by the Valuation Motion [ECF No. 25], the debt due to the Senior Lender is $823,372.03[6]. The Debtor's Senior Debt does not meet the eligibility requirements of the HAMP Program and it would appear that the Debtor would not be entitled to a HAMP loan modification. In the unlikely event that the Senior Lender does offer the Debtor a loan modification, the monthly payment required pursuant to the terms of the loan (not taking into account the $382,283.29 in arrearages due under the note) is $4,334.02.[7] Based on the income scheduled and confirmed as accurate by the testimony of Debtor, the Debtor does not have the ability pay this obligation.

---

[5] Home Affordable Modification Program (HAMP), Section on Eligibility, https://www.makinghomeaffordable.gov/steps/Pages/step-2-program-hamp.aspx

[6] Based on the scheduled debts and the value of the Real Property the Debtor does not seem to meet the eligibility requirement of Section 109(e) of the Bankruptcy Code

[7] The Notice of Payment Chtange filed by the Senior Lender on January 4, 2016 in the First Bankruptcy Case sets forth this payment based on the variable interest rate (3.625%) detailed in the Senior Lender's Proof of Claim (8-1).

Tellingly, when the Debtor was traveling under a plan[8] that included a payment to the Senior Lender, the Debtor fell behind on the plan payments causing the case to be dismissed for failing to remain current. Trial Tr. 19. The Debtor subsequently moved to reinstate the matter without including the Real Property in the Plan. In the Debtor's Motion to Reinstate, the Debtor sought to modify the Confirmed Plan to remove the Real Property from being treated under the Plan. Moreover, the Modified Plan filed with the Motion to Reinstate explicitly states the Debtor's reason for removing the Real Property from the Plan was her inability to afford the plan payments to the Senior Lender. *See* [ECF No. 121] in the Prior Bankruptcy Case. If the Debtor's income as of her August 23, 2016 loan modification application has not increased from her income in her First Bankruptcy Case, the Debtor would still be unable to make any payments towards the Senior Debt.

The Debtor's Plan payments in this matter are $1,480.12 [ECF No.71]. The Debtor testified that these payments are more comfortable than the payments under the Confirmed Plan in the First Bankruptcy Case. Trial Tr.24. This statement illustrates the Debtor's intention not to pay the Senior Debt and her desire to keep the status quo of residing in the Real Property without paying any debts associated therewith. In the First Bankruptcy Case, the Debtor was traveling under a Confirmed Plan that provided payments to the Senior Lender and demonstrated the requisite good faith in dealing with her creditors. However, the Debtor has now elected to continue to reside in the Real Property, but to remove the claim of the Senior Lender from the Plan and consequently stop paying the Senior Debt through the bankruptcy because a bankruptcy plan without payments to the Senior Lender is "more comfortable" for the Debtor. Trial Tr. 24.

[8] In the First Bankruptcy Case the Debtor's Fifth Amended Plan was confirmed by this Court and contained a $2,600.00 payment to the Senior Lender.

Despite the Debtor's inability to afford the payments to the Senior Lender for the Real Property, the Debtor has asked that this Court to confirm a Plan stripping Trust Mortgage of its rights in order to allow the Debtor to reside in a property that she cannot afford. To support this controversial and arguable impermissible request, the Debtor has provided testimony from her daughter, Sabrina Olivares ("Ms. Olivares") and her daughter's boyfriend, Jorge Cabrera ("Mr. Cabrera") that in the future, should the Debtor receive a modification, Ms. Olivares and Mr. Cabrera will move into the Real Property with the Debtor and contribute roughly $2,000.00 to assist the Debtor with the mortgage expenses. Trial Tr. 67. Although Ms. Olivares and Mr. Cabrera testified to an ability to assist the Debtor in the future, neither individual is currently assisting the Debtor and neither individual is under any contractual obligation to assist the Debtor. Trial Tr. 65-66, 73. Furthermore, the income of Ms. Olivares and Mr. Cabrera was not disclosed in the First Bankruptcy Case, is not disclosed in the Debtor's schedules filed in this matter, and is not listed as a contribution in the August 23, 2016 loan modification application. Additionally, Mr. Cabrera has testified to mortgage, vehicle, insurance and condominium association obligations, roughly totaling $1,750.00. Trial Tr. 71-72. Accordingly, the Debtor's argument that she will be able to make mortgage payments to the Senior Lender and fund her Plan is pure speculation. Additionally, the roughly estimated $2,000.00 in possible assistance Ms. Olivares and Ms. Cabrera may be able to provide to the Debtor at some point in the future is not enough to cover a realistic monthly mortgage payment necessary to pay a $823,372.03 debt.

Although Ms. Olivares and Mr. Cabrera testified that they can assist the Debtor with mortgage expenses, neither have previously and neither are currently providing any assistance to the Debtor. The Debtor would like the Court to confirm her Plan, and allow her to proceed to attempt to secure a modification on a loan that she, by her own testimony, cannot afford, in the hopes that at some future point her family members will assist with her contractual obligations. If the true intention of the Debtor

and her family were to combine their funds and save the Real Property, the time to have done so would have been in the First Bankruptcy Case when the Debtor was paying the Senior Lender through the Confirmed Plan. It should be noted that even if the Ms. Olivares and Mr. Cabrera were contributing the $2,000.00 as testified, the total amount available to fund the Plan would be $3,480.12[9]. This amount is still insufficient to fund a realist payment to the Senior Lender. As previously noted, the Confirmed Plan, which the Debtor has testified to being unable to pay was for a payment of $5,076.78. Even with the help of Ms. Olivares and Mr. Cabrera, there are not enough funds available to fund a plan and pay the Senior Lender the amount required to modify the loan.

**b. Lack of loan modification attempts**

The Debtor's history in attempting to modify the Senior Lender is spotty, sporadic and lacking any motivation or urgency. It is apparent that the Debtor has been content living in the Property without making any mortgage payments for over eight years. Indeed, the Debtor's attempts at restructuring or bringing current the Senior Debt have been nearly non-existent. At her deposition, the Debtor testified that she attempted to secure a loan modification with the Senior Lender prior to filing the First Bankruptcy Case. Debtor Dep. 74-75, September 21, 2016. The Debtor failed to provide any documents evidencing these alleged attempts. At one point in the First Bankruptcy Case, the Debtor elected to treat the Senior Debt through the MMM Program. The package submitted to the Senior Lender through the MMM Program was incomplete because it failed to provide proof of the Debtor's income. Not only was the package incomplete when sent to the Senior Lender, but the Debtor did not follow the procedures prescribed by this Court when participating in the MMM Program.

[9] This amount was calculated by combining the future contribution of $2,000.00 and the Debtor's disposable income as reflected in this case.

On June 5, 2015, the Debtor filed her Attorney-Represented Debtor's Verified "Out of Time" Motion for Referral to Mortgage Modification Mediation (the "MMM Motion") *See* [ECF No. 100] in the Prior Bankruptcy Case. In the MMM Motion, the Debtor avers that her initial loan modification forms had been generated and were ready for submission and that all required supporting documentation had been submitted to the Debtor's attorney. On August 3, 2015, the Court ordered participation in the MMM Program. Pursuant to the Court's Order, the parties had fourteen (14) days from the date of the Order to select a mediator. The Debtor's Notice of Selection of Mediator was not filed until October 8, 2015, sixty-seven (67) days after the Order was entered. Moreover, on October 8, 2015, the Debtor executed a loan modification package without including proof of the Debtor's income, in direct violation of this Court's order requiring a complete loan modification package with supporting documentation to be completed before the filing of the MMM Motion. The Debtor testified at her deposition that the MMM Program was not completed in her First Bankruptcy Case because she dismissed the case. Debtor Dep. 76. As described in detail above, the Debtor intentionally dismissed the case and elected not to continue with the MMM Program because a plan payment that actually repaid her obligation to the Senior Lender was not comfortable for her and she could not afford to make the payment. Trial Tr. 19, 24.

On August 23, 2016, over three months after the commencement of this second bankruptcy case, and after Trust Mortgage's objection to the Valuation Motion and confirmation of the Plan were scheduled for evidentiary hearing, the Debtor submitted an incomplete loan modification package to the Senior Lender. At the Debtor's deposition, the Debtor testified that she did not make any loan modification attempts between the Initial Dismissal of her First Bankruptcy Case and the August 23, 2016 loan application. Debtor Depo. 74. As of the September 21, 2016 deposition of the Debtor, the Senior Debt still had not received a complete loan modification package. Debtor Depo. 45. This

minimal and languid attempt to secure a loan modification evidences the Debtor's complete lack of sincerity or commitment in attempting to resolve the Senior Debt and the Debtor's true motivations of residing in the Real Property without paying the underlying obligations. Other than payments that were made through the Debtor's failed chapter 13 plan to the Trustee in the Debtor's First Bankruptcy case, the Debtor has not made any payment to her Senior Lender in over eight years.

**c. The sole purpose of this bankruptcy was to delay Trust Mortgage's May 16, 2016 foreclosure sale**

Trust Mortgage was granted stay relief by order of this Court and agreement of the parties in the First Bankruptcy Case. In order to file this second bankruptcy case, the Debtor moved to dismiss the First Bankruptcy Case without prejudice, or in the alternative to vacate the order vacating the order granting the valuation motion as to Trust Mortgage's lien. Pursuant to the Motion to Dismiss or Vacate, the basis of the Debtor's request for relief was that the Debtor had made a mistake under economic duress when agreeing to the terms of the Order Reinstating the First Bankruptcy. However, this request for relief is contrary to the Debtor's true intentions and agenda (as reflected in her testimony) which is to frustrate Trust Mortgage's attempt to foreclose on the Real Property. Trial Tr. 44-45. The Debtor's actions in dismissing the First Case and filing this matter were calculated and deliberate actions, taken to delay the collection efforts of Trust Mortgage and to avoid making any substantial payment to the Senior Lender through the MM Program.

**d. The fee shifting provision of Florida Statue 57.105 does not provide for the Court to award the Debtor's attorney's fees to be paid by the Creditor.**

The Debtor requests that Trust Mortgage be held liable for attorney's fees under the reciprocal attorney fees provision of Fla. Stat. § 57.105 for the Debtor's filing and prosecution of the Valuation Motion. The Debtor states that "[u]nder the loan documents the lender is entitled to attorney's fees as a result of the litigation of the mortgage . . . and . . . [u]nder Florida Statute 57.105 attorney's fees are

reciprocal." Essentially the Debtor is asking the Court to require Trust Mortgage to pay for the Debtor's privilege of attempting to strip Trust Mortgage's lien which privilege only arises under federal bankruptcy law. The Debtor's position is that every time a motion is filed to strip a second mortgage lien (and an attorney's fees provision is included in the underlying loan documents) the debtor should be entitled to attorney's fees for the costs of bringing and filing that motion.

The Debtor is not entitled to attorney's fees from Trust Mortgage. The basis of Trust Mortgage's objection to the Valuation Motion is in essence an objection to Confirmation. Because the Valuation Motion is tied to confirmation of the Plan, and the plan cannot be confirmed, the lien strip motion cannot be granted. The Debtor is not seeking to enforce any contractual rights in the Valuation Motion or in the confirmation of the Plan. Indeed, the Debtor does not attach or reference any contract or agreements between the Debtor and Trust Mortgage in the Valuation Motion. Fla. Stat. § 57.105 only provides for reciprocal attorney fees if a party is taking an action with respect to a contract prevails. The statute provides in pertinent part that "[i]f a contract contains a provision allowing attorney's fees to a party when he or she is required to take any action to enforce the contract, the court may also allow reasonable attorney's fees to the other party when that party prevails in any action, whether as plaintiff or defendant, with respect to the contract." Fla. Stat. 57.105(7). Here, the relief in the Valuation Motion (to value the Real Property and extinguish Trust Mortgage's lien) is premised upon section 506(a) of the Bankruptcy Code and Rule 3012 of the Federal Rules of Bankruptcy Procedure. These are rights and powers afforded the Debtor under Federal Bankruptcy law and are not ones that arise under any contract between the Debtor and Trust Mortgage. Simply put, the action is not "with respect to the contract." A review of bankruptcy case law demonstrates that this reciprocal attorney provision is generally limited to non-dischargeability actions, which is logical given that it is a claim that is arising under a contract that is being litigated in those circumstances. <u>See e.g.</u>, <u>Transouth Financial Corporation</u>

of Florida v. Johnson, 931 F.2d 1505 (11th Cir. 1991) (permitting a creditor to recover attorney fees as part of its claim under Fla. Stat. §57.105 in a successful non-dischargeability action under section 523 of the Bankruptcy Code); In re Martinez, 416 F.3d 1286 (11th Cir. 2005) (permitting a debtor to recover attorney's fees as part of a successful defense of a non-dischargeability action under section 523 of the Bankruptcy Code pursuant to Fla. Stat. §57.105). In the Valuation Motion, the Debtor neither disputes the amount of Trust Mortgage's claim nor the validity of Trust Mortgage's lien under Florida law. The Debtor is simply seeking to take advantage of rights solely afforded her under the Bankruptcy Code.

**Conclusion**

For the foregoing reasons and arguments, the Court should not confirm the Debtor's Plan and deny the Valuation Motion.